All right, our final case for today, it's now afternoon, is United States v. Henry Posada. So we'll hear first from Mr. Dufout. May it please the court, counsel. Your honors, this case comes before the court focused on one specific issue related to sentencing. And that specific issue is whether or not the district court clearly erred with respect to the loss amount calculation in this case. Briefly, some background for the case, as your honors know from the briefs. This involves a healthcare fraud case, an 18-count indictment in March of 2017, where the government's position in the indictment and going to trial was that every claim Mr. Posada had ever filed to the tune of over $10 million was fraudulent. Every dollar he had ever earned to the tune of $5.1 million was fraudulent. And after a week-long trial, Mr. Posada was found guilty on all 18 counts. However, after a week of government evidence, government witnesses, government surveillance, and defense witnesses, the government recognized and even reflected in the closing argument that the position couldn't be that this was a business. This wasn't a business. It didn't have any real clients, any real services. And in fact, there was absolutely many claims that were filed that were incorrect. Many. Well, but one of the problems I have with the approach in your brief, you wouldn't really have to start with the jury's conclusion that he was guilty on these 18 counts of healthcare fraud. And I get the sense that you're swimming upstream a bit, trying to push back against that. But certainly at the sentencing stage, the pre-sentence investigation report tries to come up with an estimate of the amount of loss that one should use for 2B1.1. And after a lot of back and forth, it winds up approximately $4 million. But this, you know, he was seeing a lot of people at the same time, or he wasn't really in San Francisco, or he happened to be an extraordinarily efficient chiropractor, whatever. I think most of that is off the table because of the convictions. Well, Your Honor, respectfully, I think that each of the convictions involves an individual and an individual count with respect to whether or not they provided those individual services. I think when we were arguing about the loss amount, our position was that while there were many instances of claims that were not correct, this evidence is still valid for sentencing purposes. But whose fault is that? He wasn't keeping any records. I mean, the district court is forced, and I mean institutionally, so the probation office, everybody dealing with this, to reconstruct these data. And there is evidence that provides a rational estimate. Maybe there are other rational estimates, too, but that's not our concern. Our question is whether this number, the $4 million or so, amounts to clear error. Yes, Your Honor, and I think respectfully, the district court identified five particular points in sentencing very clearly that led the court to adopt the reasonable estimate and find that this number was a reasonable estimate. I think respectfully, when you look at each of those, there are problems with each of those individually. But more importantly, Your Honor, for example, the math and the comparison of the physical therapists, Mr. Latane and Mr. Tu, to what Mr. Posada was performing, it led the court to disregard a lot of evidence, Your Honor. It's absolutely true there was an absence of record. He didn't so much disregard. It comes up with an average number, the 20 a day or so, although gives Mr. Posada the credit. I mean, he could be at the ends of the earth. He got credit for 20 a day. Even if it was clear he wasn't there, he gets credit for the 20 a day. And maybe there were some days there were 40 people. I don't know. You do run into problems whether he was committing further fraud if he was billing a two-minute encounter at 98941 because you can't do that. That's not what that code is for. But it's an estimate. It's kind of an average number based on the best information available. Yes, Your Honor. And we're definitely here before the court. What we're arguing is that it should be the $3.5 million or less. And I think, again, when you look at the estimate that the court took some missteps there. But where can you get that kind of precision? I mean, it seems to me the district court did explain how it gets to his number. And your brief says that a couple of times. You've got to be below the $3.5 million mark. But I don't know. Where do you peel off the $500,000? Absolutely, Your Honor. Well, for example, the Medicare spreadsheet has 83. Just to take one example, the Medicare spreadsheet presented by the government at trial has 83,000 entries, approximately 83,500 entries, presented on day one in the afternoon. And each of those came out to an average of approximately $26 a claim. So just taking that as one example in the Medicare data, you're looking at, to get to that, it's approximately $580,000 extra dollars on resentencing. You're looking at 22,500 additional claims over the course of 96 months. And when you boil that down, that comes up to about 18 more claims per day. So if you have 20 and you're looking at 38, respectfully, I think the evidence we've identified, absolutely what we have, and the judge took issue with the sample size. Admittedly, we have three categories of evidence, and the sample sizes vary. Acknowledge that, Your Honor. But when you look at those samples, they corroborate each other. And I also think— Because Mr. Posada made it impossible to become more precise. Absolutely, Your Honor. And I want to be as clear as I can. I'm not here before the court asking for him to be rewarded for his lack of records. All I'm asking is the court to consider whether the district court properly considered the evidence that was there.  Four patients, Your Honor, that significantly, when you look at the time of the testimony, they covered a substantial amount of the relevant time period. And we're talking about people who testified, unchallenged by the government, that they went, when you add it up, 600 or 700 visits in the office. Real, firsthand, direct visits. And you have 1,500 visits from these four individuals, but yet not a single record. And Mr. Posada doesn't deserve to get credit for all of—and to be rewarded for that. But I do think that the court went too far in disregarding these live witnesses. He said that they didn't speak with precision, but these were senior citizens who talked about it was always busy. They were handing out his comments. Well, that's what he says. It's just a lot of adjectives. Well, that's true, Your Honor. I mean, I think that—I mean, they're not district court judges. They're not lawyers. I mean, they came in, and their descriptions were unchallenged by the government. In fact, the government's cross-examination, frankly, sometimes teased out further important points, including the important point, Your Honor, of timing. And the two key witnesses on the timing issue were Ms. Nunn and Ms. Samuels. And that was at our appendix, page 56, and appendix page 52, where, respectfully, it wasn't the case that they said, the chiropractor spent 15 or 20 minutes with me. The testimony talked about, he put a heating pad on my back. He put a machine, and I lay there, and he relaxed. And, Your Honor, in a vacuum, that might not be sufficient, but I think it's noteworthy when you talk about Mr. Latané, a government witness, who, by the records, 72 times over six years. So about once a month. It's not every day. But when he was there, he consistently said—and this, I think, is significant when you're thinking about the timing question—that there'd be three to four people in different rooms, and Mr. Posada would be moving from room to room, consistent with the idea of a chiropractor not physically being present 15 to 20 minutes. And the reason that I think that that's significant, Your Honor, is when you look at, for example, the government's own surveillance. In my time wearing different hats, I've rarely seen government surveillance that confirms the defense's theory. We have two instances right before the search in November 2015 where a very experienced Health and Human Services agent said 26—he said patients. That's not our words. Twenty-six patients entered in two hours and 15 minutes. And respectfully, the district court disregarded that evidence because he said that the court said the math didn't work. But first, the court misread the report. The report specifically said that he— Yes, Your Honor. Thank you, Your Honor. I see I'm into my rebuttal time, and I will—if I may, I would just— You can save—well, finish your thoughts. My only thought on this, Your Honor, I think, is when the surveillance evidence, the timing question is key because the rest of the evidence was discounted in light of the judge's view of what the math had to be. All right. And I'd save the rest of my time for rebuttal. You'll have about a minute and a half, then. Mr. Bindi? Good afternoon. May it please the Court. The district court made a finding on the loss calculation based on reliable evidence regarding the only disputed factor that was—needed to be decided at the sentencing hearing, and that's the number of patients per day that the defendant should be given credit for having legitimately treated to come up with an offset figure from the total— So the total was the $10 million sum in the indictment? Yeah, the total billing was in that range, and then— So you were just trying to deduct for services that he actually performed? That's correct. Do you know anything at all about the number of hours per day that he spent typically working when he was in the office, or what length of time the services he provided to patients could be expected to take, or is it all just inference and guesswork? Well, the testimony was—there was testimony from some patients that when they were being treated by the defendant, the treatments lasted in approximately the 15- to 20-minute range, and the district— That's five patients. Pardon me? Those five patients. Correct, and that was the testimony that the district court relied on. There was also testimony from the two physical therapists regarding the number of patients that they would treat on an average day that they worked, and granted, that's not going to correspond directly with what the defendant was doing. nearly doubled that number and gave the defendant credit for that. When you're talking about 20 patients per day, it corresponds to the notion that you're treating the patient for about 20 minutes, 15- to 20-minutes each. That is going to come up to about 20 patients per day in a seven-hour day. The evidence that the district court relied on, it sort of cross-corroborates and comes together. Again, this is a reasonable estimate, not a precise estimate, and the district court's finding was correct and certainly does not rise to the level of clear error. For that reason, we would request that the court affirm the judgment. Thank you. All right, thank you. All right, Mr. DeVoot, we'll let you finish up. Thank you, Your Honor. I would appreciate the opportunity to briefly respond to those three good questions. First of all, to clarify, in the indictment, the allegation is, Your Honor, that $10 million worth of claims were filed. $5.1 million was paid fraudulently, and then the number that the government settled on at sentencing was $4,087,000. So the allegation was not a $10 million payment, it was a $10 million file. With respect to Your Honor's question about, what do we know about a workday? Well, Your Honor, we can look at the government surveillance and the government's witnesses to tell us about an average workday. Number one, in the defense version, which is docket number 67-1, Exhibit B, those two surveillance reports by the government, both have Mr. Posada arriving on Monday, Wednesday, and Fridays at approximately 815. And on one of them, when the agent leaves at 2, he's still there. And when the other one, when the agent leaves at 11, he's still there. Mr. Latané, his testimony, 72 times, is that when he worked from 3 to 7 or 3 to 8, and Your Honor, this is at A24 and A14-15, that Mr. Posada was always there because Mr. Latané didn't have a key. He had to get in. He was always there. And when he was always there for those additional three or four hours, there's three or four hours in the morning, there's three or four hours in the evening, he was seeing patients bouncing from room to room. Similarly, Mr. Posada and the physical therapist are apples and oranges. The district court did have a concern about doubling up the number. But when Your Honor looks at the description of the work, the codes for the physical therapist, Your Honor, I know you've seen cases 97001 and 97110. They testified that they spent between a half hour to an hour with those patients because they're required to by those codes. And the government put that evidence on. There was no evidence whatsoever about CPT-98941 by single government evidence, excuse me, witness, in terms of spinal manipulations. Okay. Thank you, Your Honor. Thank you very much. Thanks to both counsel. We'll take the case under advisement and the court will be in recess.